**In re Nelson Bunker HUNT and Caroline Lewis Hunt, Debtors.**

**Nelson Bunker HUNT, Plaintiff,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Defendant.**

**In re William Herbert HUNT and Nancy Jane Broaddus Hunt, Debtors.**

**William Herbert HUNT, Plaintiff,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Defendant.**

Bankruptcy Nos. 388–35726–HCA–11, 388–35725–HCA–11.

Adv. Nos. 388–3744, 388–3745.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Dec. 8, 1988.

---

1. This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

Russell L. Munsch, Michael F. Wurst, Decker, Hardt, Kopf, Harr, Munsch & Dinan, P.C., Dallas, Tex., for Nelson Bunker Hunt and Caroline Lewis Hunt, debtor/plaintiff.

Steven A. McCartin, Dean W. Ferguson, Gardere & Wynne, Dallas, Tex., for William Herbert Hunt and Nancy Jane Broaddus Hunt, debtor/plaintiff.

Steven H. Meyer, Edward Gelderman, Commodities Futures Trading Com'n, Washington, D.C., for Commodities Futures Trading Com'n, defendant.

Hugh M. Ray, Jeffrey E. Spiers, Andrews & Kurth, Dallas, Tex., for Manufacturers Hanover Trust Co.

## MEMORANDUM OPINION ON DEBTORS' VERIFIED COMPLAINTS FOR INJUNCTIVE RELIEF PURSUANT TO 11 U.S.C. § 105(a)

HAROLD C. ABRAMSON,
Bankruptcy Judge.

### I. Procedural Background

On October 25, 1988, Messrs. Nelson Bunker Hunt ("NBH") and William Herbert Hunt ("WHH") (the "Debtors") filed their Verified Complaints for Injunctive Relief Pursuant to 11 U.S.C. § 105(a)' ("Complaints"), seeking temporary injunctions against the Commodity Futures Trading Commission's ("CFTC" and "Defendant") Enforcement Action ("CFTC Action") during the pendency of their Chapter 11 proceedings.

On October 27, 1988, this Court commenced a hearing on the Complaints, and considered the opening arguments of counsel for the Debtors, counsel for Manufacturers Hanover Trust Company ("MHTC") and counsel for the CFTC as to the general background of the Complaints. After a brief recess, the parties announced to the Court that they would agree to certain extensions of time in the CFTC Action, and the hearing was recessed until November 7, 1988.

On November 7, 1988, the Court continued the hearing on the Complaints. At the close of the hearing, the Court instructed counsel to present an analysis of the record in light of the evidence presented, briefs and memoranda previously filed, and the Court's discussion with counsel. Also before the Court is CFTC's Motion for Dismissal of Debtors' Complaints filed on November 30, 1988.

## II. Factual Background

On February 28, 1985, the CFTC initiated an administrative proceeding against Messrs. NBH, WHH, Norton Waltuch, and others including International Metals Investment Company, LTD. ("IMIC") styled: *In the matter of Nelson Bunker Hunt et al.*, CFTC Docket No. 85–12 (the "CFTC Action"). The CFTC Action arises out of events in the market for silver and silver futures contracts during the period from September 1979 through mid-March 1980. At that time, the price of silver and silver futures contracts rose to unprecedented levels. The CFTC Action alleges that the Debtors were members of a conspiracy, acting alone and in concert with others, to manipulate the price of silver and silver futures contracts in violation of the Commodities Exchange Act ("CEA"). The CFTC Action seeks a finding that the Debtors and the other respondents violated the CEA, an Order requiring the Debtors and the other respondents to cease and desist from the alleged CEA violations and seeks to permanently enjoin the Debtors and the other respondents from all future trading in commodity futures markets. The CFTC Action also seeks to assess civil penalties against each respondent of not more than $100,000 for each alleged violation. The Debtors have filed answers in the CFTC Action denying all alleged liability.

The CFTC Action is related to a series of civil damage actions against the Debtors and others, all of which are pending in the United States District Court for the Southern District of New York. Among those civil actions is a case styled: *Minpeco, S.A. v. Nelson Bunker Hunt et al.*, S.D.N.Y. 81 Civ. 7619 (MEL), in which a six month jury trial was recently concluded. Like the CFTC, the plaintiff in *Minpeco* alleged that the Debtors and others engaged in a conspiracy to increase the price of silver and silver futures contracts in violation of the CEA, as well as violations of the Sherman Act, the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and New York common law fraud (the "Minpeco Action"). The Minpeco trial lasted for more than six months and produced more than 17,000 pages of transcript. Thousands of pages of documents were introduced into evidence. The Minpeco jury returned a verdict for the plaintiff in the amount of $132.45 million (after trebling under the antitrust laws and RICO and after the deduction of settlements which the plaintiff had received from others whom it had named as defendants). On September 1, 1988 judgment was entered in the amount of $132.45 million. The Debtors have filed post-trial motions to set aside all and parts of the jury verdict, or in the alternative, for a new trial. If the post-trial motions are unsuccessful, the Debtors intend to pursue an appeal to the United States Court of Appeals for the Second Circuit.

During the *Minpeco* trial, the CFTC Action was abated so that the Debtors and their attorneys could turn their undivided attention to the *Minpeco* trial. On September 9, 1988, the Administrative Law Judge ("ALJ") presiding over the CFTC Action ordered the resumption of the Enforcement Proceeding on October 17, 1988. On September 21, 1988 the Debtors filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. The Debtors apprised counsel for the CFTC and the ALJ

of the Debtors' bankruptcy cases by correspondence from special counsel dated September 23, 1988. On September 29, 1988, the ALJ entered an Order postponing the hearing pending further Order.[1] On October 13, 1988 the CFTC filed a Motion for Summary Disposition before the ALJ seeking to apply the doctrine of collateral estoppel against the Debtors based on the jury verdict and judgment in the *Minpeco* Action to preclude the presentation of certain defenses in the trial of certain issues in the CFTC Action. In response to the CFTC's Motion for Summary Disposition, the Debtors filed their Verified Complaints for Injunctive Relief in this Court.

### III. Contentions of Parties

A. General Overview of Hunts' Contentions

While the Debtors' Complaints do not formally request the Court to find that the CFTC Action is automatically stayed by 11 U.S.C. § 362(a), the Debtors readily concede that the CFTC Action is exempt from the automatic stay to the extent that the CFTC, as a governmental unit, seeks to exercise its police and regulatory functions. In particular, the Debtors do not dispute the CFTC's efforts to prevent the Debtors from engaging in violations of the CEA and injunctive Orders prohibiting the Debtors from all future trading in the commodity futures markets.[2] The Debtors strenuously argue, however, that the governmental regulatory exemption of 11 U.S.C. § 362(b)(4) does not apply to the extent the CFTC Action devolves into an effort by the CFTC to satisfy its own pecuniary function.

Debtors' Complaints for injunctive relief are premised on the contention that continued prosecution of the CFTC Action before the ALJ at this time will result in irreparable injury to the Debtors and the estates,

and will effectively usurp this Court's obligation to administer the estates consistent with the requirements of the Bankruptcy Code.

The Debtors contend that injunctive relief is necessary and appropriate to stay the CFTC Action because the CFTC's Motion for Summary Disposition, which seeks the application of the offensive use of collateral estoppel, is at best premature during the pendency of the *Minpeco* post-trial motions. The Debtors also assert that the offensive use of collateral estoppel by the CFTC is potentially unfair and unjust. The Debtors note that the probability of inconsistent or conflicting judgments, as well as the probability of wasteful and duplicative effort, would result from the premature use of offensive collateral estoppel.

The Debtors submit that if the CFTC Action is allowed to proceed during the pendency of the post-trial motions, and if those motions are ultimately granted whereby the Minpeco judgment is modified or set aside altogether, the dollars and time spent combatting the CFTC's Motion for Summary Disposition will have been wasted. Permitting the CFTC Action to proceed at this time, the Debtors contend, will produce the very result that use of collateral estoppel is intended to prevent, i.e., unnecessary duplication of expense and effort.

B. General Overview of MHTC's Contention

MHTC as a creditor and party-in-interest through its Memoranda in Partial Support of Debtor's Verified Complaints submits that the CFTC Action is partially stayed by the Debtors pending bankruptcy cases. Like the Debtors, MHTC concedes that the CFTC's efforts to enforce its police and

---

1. The ALJ's Order postponed the October 17, 1988 hearing as well as finding that the proceeding was not stayed by the Debtors filing of petitions in bankruptcy. We discuss this action in further detail *infra* at 489.

2. While the Debtors do not dispute the CFTC's ability to pursue the injunctive Orders, the Debtors contend that the CFTC action is unnecessary given their agreement to the entry of an order

directing them to cease and desist from violations of the CEA and to be enjoined from trading in the commodity futures markets during the pendency of the bankruptcy cases. We would also note that on October 27, 1988 this Court signed an Agreed Amended Interim Operating Order prohibiting the Debtors from trading in the commodity futures markets during the pendency of these cases.

regulatory power by requiring the Debtors to cease and desist from violations of the CEA and to enjoin the Debtors from all future trading on commodity futures markets is exempt from the automatic stay. MHTC suggests, however, that the CFTC's request for civil penalties against the Debtors is an attempt to protect a pecuniary interest "under the guise of an injunctive proceeding of the CFTC" and is subject to the automatic stay by virtue of 11 U.S.C. § 362(b)(4), thus obviating the need to impose a stay under 11 U.S.C. § 105(a).

### C. General Overview of CFTC's Contention

The CFTC contends that in its role as overseer of commodity futures market activities, continued prosecution of the administrative action is a matter of grave concern to the CFTC and the American public. CFTC views the Debtors' requests for injunctive relief as attempts "to hide behind a bankruptcy court as a vehicle to avoid potential enforcement liability."

The CFTC, in reliance upon the Administrative Law Judge's September 29, 1988 Order, asserts that the CFTC Action is exempt from the automatic stay.

The CFTC contends that the requests for injunctive relief should be denied because the Debtors have not established a significant and immediate threat to the assets of their estates, and have failed to meet the criteria for temporary injunctive relief. Without directly responding to the Debtors' contention that the offensive use of collateral estoppel is premature, the CFTC opines that the summary disposition motion, if granted, "would obviate the need for a hearing on liability issues, thereby sparing the Hunts any legal fees that would otherwise arise from the liability hearings." Likewise, the CFTC notes that the Debtors' claims that irreparable harm would result from sustaining unrecoverable losses to their estates by having to pay legal fees arising from their opposition to the CFTC's pending summary disposition motion is "pure hyperbole" and "disingenuous." The CFTC again opines that "the maximum expenditure facing the estates

would be the costs of drafting an opposition to a 30 page memorandum, and possibly, the cost of appearing at a hearing to argue the motion."

The CFTC affirmatively contends that a stay of the CFTC Action would needlessly frustrate its enforcement efforts already delayed by numerous discovery and scheduling disputes, as well as the Minpeco Action. The CFTC urges that to further thwart the CFTC's enforcement agenda against the Debtors the Commission would nevertheless move forward with the case against other remaining respondents, which would possibly multiply the number of trials at great expense to the agency.

Following the above outline of the parties respective contentions, the Court will analyze and discuss the specific contentions in greater detail below.

### IV. Whether the Automatic Stay Applies to the CFTC Action?

### A. PURPOSE OF THE AUTOMATIC STAY

The automatic stay takes effect under 11 U.S.C. § 362(a)(1) upon the filing of a bankruptcy petition, and acts to stay any judicial proceeding against the Debtor. The purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment. H.R. Rep. No. 595, 95th Cong., 2nd Sess. 340, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6296. The stay of pre-petition proceedings enables the bankruptcy court to decide whether it will exercise its power under 11 U.S.C. § 502(b) to establish the amount and validity of claims against the debtor or allow another court to do so, thereby preventing a "chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982).

### B. JURISDICTION TO DETERMINE APPLICABILITY OF AUTOMATIC STAY

■ Congress empowered the Bankruptcy Courts with core jurisdiction to determine the applicability of the automatic

stay. 28 U.S.C. § 157(b)(2)(A), (B), (G) and (O). In the present case, the ALJ presiding over the CFTC Action issued an Order on September 29, 1988 finding that the CFTC Action had not been statutorily stayed by the filing of the Debtors' bankruptcy petitions. The CFTC asserts that the ALJ's finding was both proper and dispositive of the issue. The fact that the ALJ found that the CFTC Action was not automatically stayed was in this Court's opinion jurisdictionally improper and non-dispositive.[3] "Whether the stay applies to litigation otherwise within the jurisdiction of a District Court or Court of Appeals is an issue of law within the competence of both the court within which the litigation is pending ... and the bankruptcy court supervising the reorganization." *In re Baldwin–United Corporation Litigation*, 765 F.2d 343, 347 (2d Cir.1985). *See also Brock v. Morysville Body Works, Inc.*, 829 F.2d 383, 387 (3d Cir.1987); *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir.1986) (District Court has jurisdiction to determine automatic stay's applicability to pending case). Accordingly, we find that the ALJ's consideration of the applicability of the automatic stay was improper, inasmuch as the jurisdiction to determine the applicability of the automatic stay is vested within the exclusive jurisdiction of the bankruptcy courts (or in certain instances the United States District Courts and United States Courts of Appeals).

Both the Congressional policy and equities favor maintenance of the Bankruptcy Court's unfettered authority to determine the applicability of the automatic stay. To whatever extent a conflict should arise between the Bankruptcy Court's authority to administer a complex reorganization case and another Court's authority to administer a proceeding, the Bankruptcy Court is the court to determine automatic stay issues. Moreover, the necessary uniformity on issues of law affecting a debtor's reorganization is best achieved by centralizing construction of the automatic stay in the bankruptcy court, subject to review by the appellate process. *See generally Baldwin–*

*United*, 765 F.2d at 348–49. Accordingly, this Court will determine the automatic stay's applicability to the CFTC Action to the extent that the action seeks to protect a pecuniary interest and recover a monetary judgment in favor of the CFTC.

### C. APPLICATION OF THE AUTOMATIC STAY

As discussed above, the automatic stay generally stays the commencement or continuation of judicial proceedings against the debtor upon the filing of a petition in bankruptcy. Several exceptions apply to the automatic stay, stated in particular in 11 U.S.C. § 362(b). The legislative history explains that paragraph (4) provides an exception to the automatic stay "where a governmental unit is suing a debtor to stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 343, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5838. Consistent with the legislative history, the courts have therefore found that actions brought by state and federal agencies to correct violations of regulatory statutes enacted to promote health and safety are exempt from the automatic stay. *See Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175, 1183 (5th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *United States v. Wheeling–Pittsburgh Steel*, 818 F.2d 1077 (3d Cir.1987); *Penn Terra, Ltd. v. Department of Environmental Resources*, 733 F.2d 267 (3d Cir.1984); *NLRB v. Evans Plumbing Co.*, 639 F.2d 291, 293 (5th Cir.1981).

█ Although Congress was clear in exempting regulatory actions from the automatic stay, it plainly drew the line at enforcement of money judgments. Because the debtor's assets are in the possession and control of the bankruptcy court, and because the assets constitute a fund out of which all creditors are entitled to share, a governmental unit's enforcement of a money judgment would give it preferential

---

**3.** The action may have been contemptuous on      the part of the CFTC, and perhaps, the ALJ.

treatment to the detriment of all other creditors. H.R.Rep. No. 595, 95th Cong., 2d Sess. 343, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6299. Thus, although the stay does not operate against actions or proceedings by governmental units "attempting to fix damages for violation of such a [health and safety] law," it does prevent a governmental unit from enforcing a money judgment. *See CPI Crude, Inc. v. United States*, 77 B.R. 320, 322 (D.D.C.1987) (the exemption of section 362(b)(4) is to be given "a narrow construction in order to permit governmental units to pursue actions to protect public health and safety and not to protect a pecuniary interest in property of the debtor or property of the estate."). With these principles in mind, we turn to the threshold issue of whether the CFTC Action to impose civil monetary penalties is in the nature of a monetary judgment.

■ Without a lengthy restatement of the CFTC's statutorily prescribed directives, the CFTC may impose a variety of sanctions against persons or entities found guilty of CEA violations. The available sanctions include imposition of civil monetary penalties depending on the gravity of the violation and the net worth of the violator. 7 U.S.C. § 9a. The CFTC's authority to assess civil monetary penalties must be distinguished from the collection of the penalties. We necessarily consider this distinction in view of Senior District Judge Barrington D. Parker's cogent analysis of the "pecuniary interest" exception in *CPI Crude, Inc. v. United States*, 77 B.R. 320 (D.D.C.1987).

In *CPI Crude* the United States Department of Energy commenced an administrative proceeding to obtain a remedial order to rectify certain alleged overpricing actions in violation of the Emergency Petroleum Allocation Act during the pendency of the debtor's bankruptcy. After discussing the apparently contradictory statements in the legislative history to 11 U.S.C. § 362(b)(4) and the "confusion involved" in

applying a pecuniary interest test, the Court rejected the debtor's contention that the DOE's effort constituted protection of a pecuniary interest, stating:

> While it is true that the assessment by the government of a debtor's liability for violations of law may look like the "protection of a pecuniary interest," such a reading of section 362(b)(4) and of that section's legislative history would render the exception unworkable. It is generally the case that the government regulates private conduct by establishing penalties for violations of certain rules it prescribes. This does not mean that when it seeks to enforce the regulatory scheme in question, it is merely seeking to protect some "pecuniary interest" in the monies represented by the penalties or damages levied. To hold otherwise would be to read subsection (b)(5) out of the statute, at least to the extent that it "permit[s] the entry of a money judgment" against the debtor. Under the "pecuniary interest" test as it seems to be applied, a money judgment could *never* be entered against the debtor, for it would necessarily represent only a "pecuniary interest in the property of the debtor", thus triggering the automatic stay.

*CPI Crude*, 77 B.R. at 323 (emphasis original). The Court further noted the "common sense" nature of its analysis and concludes by stating "[I]n other words, the assessment of the amount of money owed for violation of a given statutory provision, if it is not to be immediately enforced, will do little to interfere with the orderly resolution of the debtor's legitimate financial concerns." *Id.* at 324. While this Court agrees with Judge Parker's analysis concerning the assessment of civil monetary penalties as outside of protection of a pecuniary interest, we decline to follow the broad statement that assessment alone will do little to interfere with the orderly resolution of the debtor's legitimate financial concerns.[4] By distinguishing between the

---

4. While a governmental unit's assessment of monetary penalties may prove to be of minimal distraction to the debtor's ability to successfully resolve financial affairs, the better reasoned rule would be to analyze the potential interfer-

CFTC's effort to assess civil monetary penalties and the effort to collect the same, the Court is persuaded that the CFTC action is not in the nature of protection of a pecuniary interest or collection of a monetary judgment.

As a starting point, the civil monetary penalties assessed by the CFTC are not in the nature of a recovery of pecuniary loss; rather, they are remedial in nature and are imposed as a deterrent to violation of the CEA, *In re Brody,* [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,081 at 32,182 (CFTC 1986), and they "connote payment to the government, not payment to private parties who may have been wronged." *In re Premex, Inc.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,992 at 28,368–69 (CFTC 1984), *aff'd in part and remanded on other grounds,* 785 F.2d 1403 (9th Cir.1986). We would also note that the CFTC has no power to institute an action to collect a civil monetary penalty after it has been assessed. Collection is a matter wholly controlled by the United States Attorney General. 7 U.S.C. § 9a. Any penalties collected by the Attorney General are paid into the United States Treasury pursuant to 31 U.S.C. § 3302(b). Likewise, neither the assessment of penalties by the CFTC nor their collection by the Attorney General has any direct effect on the CFTC operating budget. For these reasons, we hold that the CFTC Action is exempt from the automatic stay to the extent the CFTC seeks to assess civil monetary damages, yet actions to collect would be stayed by 11 U.S.C. § 362(b)(5).

### V. Bankruptcy Court Jurisdiction to Enjoin Notwithstanding Exception

■ Our review of the legislative history and case law indicates that the Bankruptcy Court may enjoin actions notwithstanding an exemption from the automatic stay. Senator DeConcini's report states:

The Court has ample other powers to stay actions not covered by the automatic stay. Section 105, of the proposed title 11, derived from Bankruptcy Act

§ 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all of the traditional injunctive powers of a court of equity, 28 U.S.C. §§ 151 and 154 as proposed in S. 2266, § 201, and 28 U.S.C. § 1334, as proposed in S. 2266, § 216. Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions.

S.Rep. 95–989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787. Likewise, "[E]ven if it should be determined that the automatic stay does not apply [to the regulatory action], the Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 348 (2d Cir.1985). *See also In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y. 1987) ("The fact that the automatic stay may not apply does not mean that the Bankruptcy Court is without power to issue an injunction.")

With the understanding that the Bankruptcy Court is empowered with the discretion and authority to issue the injunction, the Courts have justified enjoining federal regulatory proceedings under 11 U.S.C. § 105 "when those proceedings *would threaten the debtor's estate,* and when the court has jurisdiction over a petition in bankruptcy under 28 U.S.C. § 1471." *NLRB v. Superior Forwarding, Inc.,* 762 F.2d 695, 698 (8th Cir.1985) (emphasis supplied). The explanation of such discretion is as follows:

It is of particular importance that bankruptcy courts be able to determine factually, on a case by case basis, whether regulatory proceedings will threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory: the

ence on a case by case basis, as the court under-

takes below.

costs incurred in defending against charges may deplete the estate. *Id.* at 699. The Fifth Circuit has similarly stated: "To the extent that the exercise of this jurisdiction [S.E.C. enforcement of regulatory powers by appointing a receiver to take possession of assets] *threatens the assets of the debtor's estate*, the bankruptcy court may issue a stay of those proceedings." *S.E.C. v. First Financial Group*, 645 F.2d 429, 440 (5th Cir.1981) (emphasis supplied). Accordingly, this Court finds that notwithstanding the exception to the automatic stay, it is nevertheless vested with full authority to issue an injunction, if merited.

### VI. Elements and Analysis of Injunctive Relief

Stays under section 105 are granted only "under the usual rules for issuance of an injunction." *In re Cournoyer*, 43 B.R. 354 (Bankr.R.I.1984), *aff'd in part, rev'd in part*, 53 B.R. 478 (D.R.I.1985), *aff'd*, 790 F.2d 971 (1st Cir.1986).

The prerequisites for issuing an injunction include:

1. a substantial likelihood that the movant will prevail on the merits;

2. a substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

3. that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and

4. that the granting of the injunction will not disserve the public interest.

*Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175, 1189 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987) (J. Randall) ("*CORCO*"); *Compton Corp. v. United States*, 90 B.R. 798, 805 (N.D.Tex.1988).

### A. SUCCESS ON THE MERITS

### 1. STANDARD TO BE APPLIED IN ANALYSIS OF SUCCESS ON MERITS

A critical inquiry in analyzing success on the merits is the degree of success movant must demonstrate. The CFTC urges that *CORCO* stands for the proposition that a substantial likelihood of success must be shown. On the other hand, the Debtors urge that a relaxed standard may be applicable given the degree of harm and "sufficiently serious questions going to the merits."

In view of the complex interrelationship between the injunction standards, the underlying CFTC Action and Minpeco post trial matters, the Court adopts the Fifth Circuit's sliding scale test, "balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Florida Medical Ass'n. v. United States*, 601 F.2d 199, 203 n. 2 (5th Cir.1979); *Texas v. Seatrain Int'l., S.A.*, 518 F.2d 175 (5th Cir.1975); *Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974). Moreover, where the potential harm to the party seeking an injunction is greater than the prejudice to the defendant, "it is not even necessary that a *substantial* likelihood of success be shown ... a showing of *some* likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980) (emphasis original).

The Second Circuit's standard for success on the merits similarly states:

> To obtain a preliminary injunction, a party must show: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*American Postal Workers Union v. United States*, 766 F.2d 715, 721 (2d Cir.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985). The Court would view the Second Circuit standard as helpful to the analysis of likelihood of success on the merits employed by the Fifth Circuit.

### 2. PROPER FOCUS OF SUCCESS ON MERITS

This being a bankruptcy proceeding, the focus of success on the merits necessarily encompasses the injunctive action as well as the underlying litigation or action to be stayed. In the Bankruptcy context, the focus on the merits varies somewhat because of the many interests involved in the bankruptcy case. The Bankruptcy Court for the Northern District of California stated in dicta that: "In the context of an action seeking relief under section 105, the likelihood of success on the merits logically must refer to whether the debtor can show that enforcement of the state laws will unduly interfere with the bankruptcy adjudication." *In re Security Gas & Oil, Inc.*, 70 B.R. 786, 793 n. 3 (Bankr.N.D.Cal.1987).

Conversely, the Fifth Circuit in *CORCO* explains that "[t]he inquiry [success on the merits] for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits giving rise to the litigation will be decided" *rather than* success on the merits "so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the [enforcement] proceeding." *CORCO*, 805 F.2d at 1189 (emphasis supplied).

Debtors' counsel properly identify four potential areas for success on the merits upon which the Court will focus in reaching a determination of whether an injunction should issue, to wit:

a. The CFTC action itself

b. The CTFC's SUMMARY DISPOSITION motion

c. *MINPECO* POST TRIAL MOTIONS AND APPEAL

d. the present injunction proceeding

With these principles in mind, we turn to the question of success on the merits.

### 3. ANALYSIS AND DISCUSSION

■ Assuming *arguendo* that the CFTC would succeed in its effort to use offensive collateral estoppel to find a violation and then impose civil penalties as a sanction, the Attorney General must sue to collect on the penalties; and he would have a judgment. This is simply a claim. The hardships to the estates would be considerable. If the Minpeco judgment is subsequently overturned, either as a result of post-trial motions or upon appeal, the Debtors must then not only seek to set aside any of the findings entered in the CFTC action should it have been allowed to proceed, but they must also separately seek to set aside any determinations based upon the CFTC findings in any of the silver litigation. Accordingly, a premature decision subject to defeasance represents a costly and potentially devastating threat to the debtors and creditors. Moreover, the CFTC has yet to demonstrate the necessity that it immediately proceed with its Motion for Summary Disposition. For these reasons, the equities militate in favor of requiring the Debtors to show *some* likelihood of success on the merits as discussed in *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980).

We would further note that the situation in this case is distinct from *CORCO*, 805 F.2d 1175 (5th Cir.1986). In *CORCO* the Debtor conceded that no likelihood of success on the merits existed, yet sought to enjoin the Environmental Protection Agency from regulatory actions pertaining ongoing health and safety violations. The Debtors in the present case have never conceded that no likelihood of success on the merits exists. Moreover, it appears that no violations of the CEA will occur during these cases given the Court's October 27, 1988 Agreed Amended Interim Operating Order. We hold that a likelihood of success on the merits of the CFTC Action exists at this time, on this record, and will be so until any appeal is concluded at the Second Circuit Court of Appeals. Finally, as discussed below, there exists substantial questions as to the merits of the CFTC's actions, whereby some likelihood that the Debtors would prevail exists.

### a. OFFENSIVE USE OF COLLATERAL ESTOPPEL

The threshold question is whether the CFTC may even attempt to use offensive collateral estoppel in view of the pending

*Minpeco* post-trial motions for judgment n.o.v. and motion for new trial.

As a general rule, a judgment must be final in order to have collateral estoppel effect. Moore's teaches that "a motion for judgment n.o.v. under Rule 50(b); a motion to amend or make additional findings of fact under Rule 52(b); a motion for a new trial under Rule 59(b); and a motion to alter or amend a judgment under Rule 59(e)" all "should destroy the conclusiveness of a judgment" since each motion destroys finality for purposes of appeal. 1B *Moore's Federal Practice*, ¶ 0.416[3] (1988). Several cases support this conclusion. *Trebesch v. Astra Pharmaceutical Products*, 503 F.Supp. 79, 82 (D.Minn.1980) (offensive collateral estoppel inappropriate in view of post trial motion for judgment n.o.v., and for an altered judgment citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), for the general rule concerning the offensive use of collateral estoppel when application would be unfair or unjust) and *Grill v. United States*, 516 F.Supp. 15, 17 (E.D.N.Y.1981).

The Restatement (Second) Judgments takes an opposite position:

> A judgment otherwise final for purposes of the law of res judicata is not deprived of such finality by the fact that time still permits commencement of proceedings in the trial court to set aside the judgment and grant a new trial or the like; nor does the fact that a party has made such a motion render the judgment non final.

Restatement (Second) Judgments § 13, Comment f. Given the conflicting authority with respect to the offensive use of collateral estoppel when a post-trial motion is pending, there exists some likelihood of the success of the Hunts demonstrating that the use is improper. We view the proposed use of collateral estoppel during the pendency of the post trial motions as a sufficiently serious question as to the merits of the underlying action. We are further concerned about the potential uselessness of the effort and its impact on the estates. Such a premature action by the CFTC constitutes a threat to the estate and its creditors.

### b. APPLICATION OF COLLATERAL ESTOPPEL

Assuming *arguendo* that the Hunts would not succeed on the threshold question of the use of collateral estoppel given pending post-trial motions, the CFTC must justify application of collateral estoppel in accordance with *Parklane Hosiery*. Under *Parklane Hosiery* trial courts are granted broad discretion to determine when offensive collateral estoppel should be applied; however, offensive collateral estoppel should be reluctantly applied when the result would be unfair to the Defendant. *Parklane Hosiery*, 439 U.S. 322, 331, 99 S.Ct. 645, 651 (1979).

While determination of the propriety of application of collateral estoppel in the CFTC Summary Disposition proceeding is beyond the province of this Court's jurisdiction, several substantive questions exist as to the propriety of applying of collateral estoppel. For example, Judge Lasker emphasized during the trial and even during the jury deliberations that the outcome of the case was substantially in doubt and could go either way. "Indeed, this was a difficult, complex case to prove and the outcome was by no means a foregone conclusion. Minpeco's case was substantially circumstantial and required the jury to draw a number of inferences from bits and pieces of evidence."

Moreover, the record reflects that Judge Lasker ruled that the court was not bound by the full CFTC's ruling in *In re Cox and Frey*, [1986–1987 Transfer Binder] Comm. Fut.L.Rep. (CCH) § 23,786 at 34,061 (CFTC 1987). *Cox and Frey* states that an essential element of the offense of manipulation is the ability to influence price, and that, as a matter of law, "[t]he accused lacks the ability to influence prices if other market participants can bypass his demand and extinguish their obligations elsewhere." *Id.* Unlike Judge Lasker, the ALJ will, however, be governed by *Cox and Frey*. While the ALJ noted factual dissimilarities between the *Cox* action and the CFTC Action, he states that "the conclusions in *Cox*

cannot under the governing rule be applied summarily here." (CFTC Exh. 14).

The probative value of the ALJ's statement is uncertain at best. The ALJ's statement was in response to the Debtors' Motions for Summary Disposition of the entire proceeding. While we do not speculate as to the ALJ's motives for denying the Debtors' motions, it is clear that a "summary judgment" type disposition was not warranted; rather, a decision would be "more appropriate for a post-hearing brief on a developed record." (CFTC Exh. 14). Moreover, while the *Cox and Frey* standard may not be "summarily applied," by the ALJ in the CFTC Action, the standard must be considered under *stare decisis.* "An agency must either conform to its prior precedent or explain its reasoning for departure from that precedent." *Laclede Gas Co. v. Federal Energy Regulatory Comm.,* 722 F.2d 272, 275 (5th Cir.1984). Although inherent factual dissimilarities pervade the cases, under *stare decisis* the legal principles governing the basis for a court's decision remain somewhat consistent. We are mindful that an agency is "free to alter its past rulings and practices even in an adjudicatory setting. However, it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents." *Hatch v. Federal Energy Regulatory Comm.,* 654 F.2d 825, 834 (D.C.Cir.1981) (citations omitted). For the CFTC to abandon the *Cox and Frey* standard, it must "provide a rational and reasonable basis for deviating from its established policy." *Trans–American Van Service, Inc. v. United States,* 421 F.Supp. 308, 316 (N.D. Tex.1976).

As the doctrine of *stare decisis* would necessarily require the CFTC to follow its established precedent, unless the reasons for departure are clearly set forth, the record further establishes that different legal standards exist when the Minpeco Action and the CFTC Action are compared. As the Fifth Circuit has stated "[O]ffensive collateral estoppel should be invoked to preclude litigation of an issue only if the party against whom collateral estoppel is urged has had a full and fair opportunity to

litigate the identical issue in the earlier case." *Davis v. West Community Hospital,* 786 F.2d 677, 682 (5th Cir.1986). Our reading of *Parklane* and *Davis* lead us to the conclusion that the Debtors would ultimately prevail on the merits of the issue of the use of offensive collateral estoppel.

Assuming that the Debtors would succeed on the collateral estoppel motions, the CFTC would be required to prove up its full case in order to prove violations of the CEA. At the same time, Debtors would be required to expend precious resources in the administrative action. Such expenditures, as explained below, constitute an element of the harm to the Debtors.

## B. IRREPARABLE INJURY TO THE DEBTORS; HARM TO CFTC; AND PUBLIC INTEREST

"Irreparable harm in the bankruptcy context refers to either irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate." *Dore & Associates Contracting, Inc. v. American Druggists' Ins. Co.,* 54 B.R. 353, 361 (Bankr.W.D.Wis.1985); *Compton Corp. v. United States,* 90 B.R. 798, 806 n. 19 (N.D. Tex.1988). The element of irreparable injury to these estates may be divided into two categories. First, the burdensome and potentially unnecessary dollar and time costs associated with the preparation and presentation of a vigorous defense of the CFTC Action. Second, irreparable harm to the creditors and estates from disruption of this Courts' exclusive authority to effectively manage these cases.

As discussed briefly above, in the event of a reversal or modification of the Minpeco judgment, any ruling or judgment rendered by the ALJ based upon collateral estoppel may be rendered a total nullity, requiring a terrible waste of time and expense to re-litigate those issues. The Debtors would be constrained to have the liability findings set aside. Moreover, Mr. Aaron Rubinstein, Special Counsel to the Debtors, testified that substantial legal fees would need to be spent in response to the CFTC's

Motion for Summary Disposition.[5] Notwithstanding the potentially cumbersome litigation expenses involved in defending the CFTC Action and the Debtors' prosecution of these cases [6], the CFTC argues that such expenses do not justify issuance of an injunction. The CFTC's argument that the expenditure of legal fees is not sufficient harm is premised on the unfounded belief that the Debtors have unlimited assets; which is not a fact known to the Court. The Court would note that an analysis of the Debtors estates and assets has yet to occur, given the infancy of these proceedings. Lastly, the CFTC has yet to demonstrate the necessity that it immediately proceed with its Motion for Summary Disposition. The events upon which the CFTC Action is based occurred in 1979 and 1980. The record indicates that the Debtors have not taken any actions since mid–1980 which would cause concern to the CFTC's regulatory mandate. Yet, in this case, the CFTC finds some need to proceed on an expedited basis.

In reaching our conclusion that a premature decision subject to defeasance represents a costly and potentially devastating threat to the debtors and creditors, we are mindful of the suggestion that "litigation expenses alone do not justify a stay of a proceeding." *EEOC v. Rath Packing Co.*, 787 F.2d 318, 325 (8th Cir.1986). While this court would agree with this proposition, we recognize that at some point the Debtors must defend the CFTC claims. We would reiterate, however, that the premature disposition of the liability issues by the use of offensive collateral estoppel would involve the incurring of needless litigation expenses. Surely the *Rath* Court would not adopt a rule suggesting that the unlimited incurrence of legal expenses coupled with the possible undoing of the result does not justify a stay of a proceeding.

Indeed, the Eighth Circuit in an earlier decision declined to rigidly extend the rule that litigation expenses will not constitute an injury sufficient to justify enjoining litigation. *NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698–99 (8th Cir.1985). In disagreeing with a contention that the expense incurred in defending against unfair labor practice charges does not constitute a threat to the assets of the debtor's estate the Court concluded:

> It is of particular importance that bankruptcy courts be able to determine factually, on a case by case basis, whether regulatory proceedings will threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory; the costs incurred in defending against [the litigation] may deplete the estate.

*Superior Forwarding*, 762 F.2d at 699. Accordingly, the Court concludes that litigation costs must nevertheless be considered as an element of harm to the debtors' estates in addition harm from the diversion of the Debtors' and counsel's attention from the Chapter 11 cases.

The other harm attendant to the present continuation of the CFTC Action, on a potentially defeasible theory, is the harm to the creditors and estate from disrupting this court's ability to effectively manage the Debtors' reorganization efforts. By presently proceeding with the CFTC Action, the Debtors would face additional demands in preparing pleadings, participating in discovery and attending hearings. These demands would clearly disrupt the Debtors' efforts to effectuate plans of reorganization during the exclusivity period of 11 U.S.C. § 1121(b), which would benefit all of the creditors in these proceedings.

A simultaneous proceeding would also disrupt this Court's timetables for resolving claims and waste preciously scarce judicial resources. CFTC suggests:

---

5. Should the CFTC succeed in its Motion for Summary Disposition, the Debtors would also be constrained to prepare extensive post-trial and post hearing briefs, including the submission of proposed findings of fact and conclusions of law.

6. The Court would observe that the estates will direct considerable energy to resolving many claims in these cases, including complex legal and factual claims by the Internal Revenue Service against one of the debtors in the amount of $295,000,000 and the other in upwards of $600,-000,000.

If the Court is concerned that the ALJ would, at some future point consider the Hunt's net worth independently of this Court's assessment, it need only direct the undersigned counsel to request the commission to direct the ALJ not to consider, nor to order any discovery on this question, until 30 days after written notification to this Court, the debtors, and the creditors, that the ALJ is ready to proceed on the question.

This suggestion is untenable. The claims objection process, which is an indivisible part of the determination of the solvency of the Debtors, can be complex and almost certainly will require more than 30 days notice. Moreover, the CFTC's net worth procedures contain no provision for the participation of creditors of these estates whose rights should be considered. By making such determinations the ALJ will usurp this Court's function as the ultimate arbiter of claims against the estate.

A bankruptcy case spawns various proceedings in the course of its pendency in the court. Those proceedings may involve motions for the engagement of professionals (11 U.S.C. § 327), for valuation of collateral (11 U.S.C. § 506), for determination of tax liability (11 U.S.C. § 505), borrowing transactions (11 U.S.C. § 364), cash collateral transactions (11 U.S.C. § 363), exclusivity determinations (11 U.S.C. § 1121), disclosure statements (11 U.S.C. § 1125), confirmation of plans (11 U.S.C. § 1129), estimation of claims (11 U.S.C. § 502) and enforcement or implementation of plan (11 U.S.C. § 1142). Another type of proceeding filed in the course of a "case" is the adversary proceeding, which is a full-fledged lawsuit (Rules Bankr.Proc.Rule 7001). Adversary proceedings involve determinations of, among other things, dischargeability (11 U.S.C. § 523), discharge (11 U.S.C. § 1141), preferential transfers (11 U.S.C. § 547), and fraudulent transfer actions (11 U.S.C. § 548). The injunction envisioned by the Court in this proceeding is not a permanent injunction. In this case, the Court will be involved in these various proceedings aiming toward the formulation of a plan by each of these Debtors. This Court will be well into the confirmation process while the CFTC determinations are still going forward.

This Court, in its experience, has in analogous situations held estimation hearings so as to estimate administrative agencies' claims for *voting* purposes only, in the confirmation process, thereby leaving the claim determination for a later proceeding before the administrative agency. This is a workable process, and protects the rights of other creditors as well as the debtors. The CFTC herein will not be harmed if it is allowed to perpetuate testimony and discovery, only awaiting a later date for the liquidation of its claims. After all is said and done, the CFTC is in the process of liquidating its claims without regard to how payment will be made. The CFTC (as well as many plaintiffs in litigation) envisions that the world revolves around its securing a determination of its claim, whether a realistic prospect of payment exists or not. At an appropriate date, after the disclosure statement hearing or the determination by the Second Circuit of the appeal matters, this Court will review the temporary injunction issued here so as to determine a proper date for the Commissions' going forward. The need for orderly and consistent administration of these estates mandates that this Court bring about a resolution of these issues in this manner without any interference by another tribunal.

Finally, the propriety of issuing an injunction depends on the injunction's effect on the public interest. Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders. H.R.Rep. No. 595, 95th Cong., 2nd Sess. 340, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6296. The Bankruptcy Court is vested with management duties to further this interest and ensure a meaningful process for all of these competing entities. *In re Timbers of Inwood Forest Associates, LTD.*, 808 F.2d 363, 373 (5th Cir. 1987) ("Early and ongoing judicial management of Chapter 11 cases is essential if the

Chapter 11 process is to survive and the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved.").

During the reorganization process, the parties posture and orchestrate conflicting positions. The process involves settlement and negotiation in the context of legal and economic rules. At the early stage of the Chapter 11, the parties must explore the positions and plan for future confrontations. As such, an improvident decision by the Court at an early stage disserves the estate, the creditors and hinders successful implementation of bankruptcy policy as announced by Congress. The early granting of an injunction further enables this Court to focus on the particulars of the Chapter 11 case and seek to protect the competing interests, fostering the Congressional intent of Chapter 11. We are also mindful of the CFTC's policy mandate to safeguard the integrity of the commodity futures markets. Following our discussion of the Congressional policy exempting governmental units from the automatic stay and the authorities approving the imposition of a stay when the regulatory proceeding would threaten the Debtor's estate[7], we would find that a temporary stay will serve both the CFTC's mandate to protect commodity markets and the bankruptcy policy. As recently stated by Judge Belew "A [discretionary] stay can be justified only if, based on a balancing of the parties' interests, there is a clear inequity to the supplicant who is required to defend while another action remains unresolved and if the order granting a stay [is] framed to contain reasonable limits on its duration." *Compton Corp. v. United States*, 90 B.R. 798, 806 n. 20 (N.D.Tex.1988), *citing GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir.1985). Accordingly, this Court finds that issuance of an injunction that remains in effect until the earlier of the Disclosure Statement hearing in these proceedings or the final prosecution of the appeal of the Minpeco judgment is fully warranted. At that time, the Court will convene hearings on notice as to the further extension or termination of the injunction. Finally, in view of the above discussion the CFTC's Motion to Dismiss the Debtor's Complaints is denied.

Messrs. Munsch and McCartin, counsel for the Debtors, are to prepare Orders reflecting the Court's issuance of the injunction and an Order denying the CFTC's motion for dismissal of Debtors' Complaints.

---

7. *See NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir.1985) and *SEC v. First Financial Group*, 645 F.2d 429, 440 (5th Cir. 1981) discussed *supra*, at 492.